J-S55015-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE:  INVOLUNTARY TERMINATION OF THE PARENTAL RIGHTS OF J.P.C., FATHER, IN AND TO T.J.K., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  J.P.C., FATHER | No. 719 EDA 2016 |

Appeal from the Order Entered February 1, 2016
In the Court of Common Pleas of Carbon County
Orphans' Court at No(s): 15-9172

BEFORE:  LAZARUS, J., DUBOW, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, J.:                  **FILED JUNE 27, 2016**

J.P.C. (Father) appeals from the trial court's order involuntarily terminating[1] his parental rights to his son, T.J.K. (Child) (born 2/12) and granting physical and legal custody of Child to maternal grandparents.  After careful review, we affirm.

Child lived with Father and biological Mother from the time of his birth until he was almost four months old, when Mother and Father were charged with retail theft after trying to steal a television from Walmart.  At the time

_____

[*] Former Justice specially assigned to the Superior Court.

[1] We review a trial court's decision to involuntarily terminate parental rights for an abuse of discretion or error of law.  ***In re A.R.***, 837 A.2d 560, 563 (Pa. Super. 2003).  Our scope of review is limited to determining whether the trial court's order is supported by competent evidence.  ***Id.***

both Mother and Father were addicted to heroin.[2]  On June 15, 2012, Child was placed in kinship care where he lived for a brief period with Paternal Uncle and then Paternal Great-Grandmother.  On June 26, 2012, Child was placed into the custody of Maternal Grandparents, with whom he continues to reside.  On July 3, 2012,[3] Maternal Grandparents initiated custody proceedings and obtained an interim order for primary custody of Child; they continue to retain sole custody of Child.[4]

Father last saw Child in October 2012, after Mother initiated a meeting between Father and Child at a local park.  Father has had no contact with Child since that date.  Father pled guilty to attempted robbery and was sentenced in February 2014 to 18-48 months' incarceration.  On May 29, 2015, Mother and Maternal Grandfather filed the instant petition to terminate Father's parental rights, seeking termination[5] under sections

---

[2] Police found heroin and drug paraphernalia in Father's car as a result of a search following the Walmart incident.

[3] Also in July 2012, Father pled guilty to driving under the influence (DUI) after he caused a serious automobile accident resulting in Mother being MedEvac'd to Lehigh Valley.  N.T. Termination Hearing, 11/24/15, at 41. Finally, in October 2014, Father was convicted of retail theft.  *Id.* at 174.

[4] In 2012, the court granted Maternal Grandparents' petition to change Child's surname to their surname.

[5] Grandfather also indicated his intent to adopt Child.  Because this is an intra-family adoption, no report of intent to adopt is required.  See 23 Pa.C.S. § 2531(c).  Nonetheless, Maternal Grandfather testified that he did file a notice of intention to adopt Child pursuant to section 2531.  N.T. Termination Hearing, 11/24/15, at 55.

2511(a)(1) and (b) of the Adoption Act.[6]  On June 29, 2015, Mother died of a drug overdose.  The court held a termination hearing on November 24, 2015, at which Father testified that he anticipated being released on parole, on his attempted robbery sentence, within the next two to three weeks. N.T. Termination Hearing, 11/24/15, at 12.  On February 1, 2016,[7] the court granted Maternal Grandfather's petition and terminated Father's parental rights under sections 2511(a)(1) and (b).[8]  This appeal follows.[9]

On appeal, Father presents the following issues for our consideration:

> (1)  Whether the trial court committed an error of law and/or abuse of discretion by granting the petition to terminate Father's parental rights by concluding that the maternal grandfather presented clear and convincing evidence that Father exhibited a settled purpose to relinquish his parental rights, and thereby ignored the Father's

---

[6] 23 Pa.C.S. §§ 2101-2910.

[7] Following the termination hearing, the court left the record open for forty days in light of the possibility that Father would voluntarily relinquish his parental rights and come to an agreement with Maternal Grandparents to maintain post-termination contact with Child.  When no such agreement had been reached at the conclusion of the forty days, the court entered its order involuntarily terminating Father's parental rights.

[8] After Mother passed away following the filing of the termination petition, Maternal Grandfather solely pursued the termination process due to his standing under 23 Pa.C.S. § 2512(a)(3), which permits an individual who has custody or standing *in loco parentis* to a child to file such petition.  With regard to a termination petition, a party stands *in loco parentis* to a child by putting himself or herself in the situation of assuming the obligation incident to the parental relationship without going through the formality of a legal adoption.  **Argenio v. Fenton**, 703 A.2d 1042, 1044 (Pa. Super. 1997).

[9] At the time he filed his notice of appeal, Father remained incarcerated.

incarceration and forthcoming parole/release, the maternal grandfather's efforts to limit or frustrate the parent-child relationship, the strained/nonexistent relationship between Father and maternal grandfather, the change of address of maternal grandfather's residence, and the Child's young age, etc., as factors beyond Father's immediate control which limited or prevented his exercise of parental rights and duties to the child.

(2)     Whether, in the alternative, the trial court committed an error of law and/or abuse of discretion by concluding that Father exhibited a settled intent to relinquish parental rights and further that the maternal grandfather presented clear and convincing evidence that Father would not remedy the conditions/refusal to perform parental duties where Father testified that his release/parole was forthcoming?

(3)     Whether the trial court committed an error of law or abused its discretion by concluding that the natural father exhibited a settled intent to relinquish parental rights, failing to consider Father's explanation for the lack of conduct – including Father's incarceration, strained/nonexistent relationship with petitioner maternal grandfather, petitioner maternal grandfather's efforts to limit or frustrate the parent-child relationship, the petitioner maternal grandfather's improperly[-] served name change petition, petitioner maternal grandfather's insistence that the child refer to petitioner as "Dad," the change of address of petitioner's residence, and the child's young age, as factors beyond Father's immediate control which limited or prevented his exercise of parental rights and duties to the child; and by failing to consider the effect of the termination, including the possibility of natural father's forthcoming release, the fact that natural father is the only surviving biological parent, the fact that the natural mother is deceased; the child's young age, and the possibility for a meaningful relationship between the child and natural father?

(4)     Whether the trial court committed an error of law and/or abuse of discretion by failing to consider the needs and welfare of the child analysis, including the paternal grandparents were attending to the child's needs; the natural father's explanation for the lack of conduct; the

strained/non[-]existent relationship between the natural father and petitioner maternal grandfather; the petitioner maternal grandfather's efforts to limit or frustrate the parent-child relationship, including the petitioner maternal grandfather's improperly[-] served name change petition, petitioner and maternal grandfather's insistence that the child refer to petitioner as "Dad," and the change of address of petitioner's residence; the child's young age; the fact that natural father is the only surviving biological parent and/or the fact that the natural mother is deceased; the child's young age; and the possibility for a meaningful relationship between the child and natural father?

Appellant's brief at 4-5.

In **In re adoption of S.M.**, 816 A.2d 1117, 1122 (Pa. Super. 2003), our Court noted:

> In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

**Id.** at 1122 (citation omitted). **See also In re C.P.**, 901 A.2d 516, 520 (Pa. Super. 2006) (party seeking termination of parental rights bears burden of proving by clear and convincing evidence that at least one of eight grounds for termination under 23 Pa.C.S. § 2511(a) exists and that termination promotes emotional needs and welfare of child as set forth in 23 Pa.C.S. § 2511(b)).

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. *In re Adoption of Dale A., II*, 683 A.2d 297 (Pa. Super. 1996). Where a parent is incarcerated, the fact of incarceration does not, in itself, provide grounds for the termination of parental rights. *Id.* However, a parent's responsibilities are not tolled during incarceration; rather, the focus is on whether the parent utilized resources available while in prison to maintain a relationship with his or her child. *Id.* An incarcerated parent is expected to utilize all available resources to foster a continuing close relationship with his or her children. *In the Interest of A.P.*, 692 A.2d 240 (Pa. Super. 1997).

Instantly, the trial court terminated Father's parental rights pursuant to section 2511(a)(1). Under section 2511(a)(1), a court may terminate parental rights where the parent demonstrates a settled purpose to relinquish parental claim to a child or fails to perform parental duties for at least the six months prior to the filing of the termination petition. 23 Pa.C.S. § 2511(a)(1). The trial court, however, should consider the entire background of the case and not simply

> mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his . . . parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004).

With regard to section 2511(a)(1), Father contends that he attempted to maintain contact with Child, while he has been incarcerated, by calling Mother on the phone and sending her correspondence for Child. Father claims that the court discounted such efforts in coming to its decision to terminate his rights.

Despite these claims, we recognize that Father did nothing actively to maintain contact with Child, either in person or over the phone, since Child was five months old and in the care of Maternal Grandparents. While Father did place two calls to Maternal Grandparents' home prior to his incarceration in June 2013, he did not ask to speak to Child. N.T. Termination Hearing, 11/24/15, at 54.[10] Moreover, the only time that Father saw Child face-to-face after his arrest in 2012 was as a result of Mother arranging a meeting at a local park. Since his visit with Child at the park, Father sent Child one Christmas card, through Mother, in December 2013. While Father initially testified that he "couldn't do anything" to father his son while he was incarcerated, *id.* at 162, he later admitted that he could have obtained Maternal Grandparent's full address to send letters to him. *Id.* at 163.

---

[10] Maternal Grandfather testified that his phone number and address have been the same for the last 20 years and that Father never attempted to visit Child at Maternal Grandfather's home or call to talk to Child. N.T. Termination Hearing, 11/24/15, at 100. Even Father admitted he had not tried to contact Child at their home. *Id.* at 149.

Father also claims that he did not attempt to contact child or send him letters because Maternal Grandparents do not allow Child to talk on the phone and they would not deliver any letters he would send to him. However, because Father never attempted to visit, call or send Child letters at Maternal Grandparent's home, any claim that Grandparents would thwart his efforts is pure speculation.

The record is clear that Father has failed to perform his parental duties since Child was five months old. *Id.* at 100, 132. Child is over four years old now and has had no meaningful contact with Father since he was removed from Father's home in 2012 as a result of Father being arrested for retail theft. *See In re C.L.G.*, 956 A.2d 999, 1006 (Pa. Super. 2008) (en banc) (cause of incarceration may be particularly relevant to section 2511(a) analysis where imprisonment arises as direct result of parent's actions which were "part of the original reasons for the removal" of the child). Under such circumstances, we conclude that the court properly terminated Father's parental rights under section 2511(a)(1).

With regard to subsection 2511(b), we note the following: (1) Child has resided with Maternal Grandparents, who have interim custody of and are a pre-adoptive resource for Child, for almost four years; (2) Maternal Grandparents provide Child with a safe and stable environment that attends to his financial, emotional, educational and physical needs; (3) Father testified that Child likely does not know and would be unable to identify him as his father; N.T. 11/24/15, at 164; (4) Child has formed a strong

attachment with Maternal Grandparents, calling them "Mom" and "Dad"; (5) termination is in Child's best interest; (6) Child will not suffer any irreparable harm if Father's rights are terminated; and (7) Child needs permanency.

Accordingly, we rely upon the trial court opinion, authored by the Honorable Roger Nanovic, in affirming the order involuntarily terminating Father's parental rights to Child. We instruct the parties to attach a copy of Judge Nanovic's 32-page decision in the event of further proceedings in the matter.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/27/2016

IN THE COURT OF COMMON PLEAS OF CARBON COUNTY, PENNSYLVANIA

ORPHANS' COURT

In re:                              :
    TERMINATION OF PARENTAL         :
    RIGHTS OF J.P.C.                :       No. 15-9172
    IN AND TO T.J.K., A MINOR       :

Kim R. Roberti, Esquire              Counsel for G.J.K.
Joseph V. Sebelin, Jr., Esquire      Counsel for J.P.C.
Arley L. Kemmerer, Esquire           Counsel for T.J.K.

MEMORANDUM OPINION

Nanovic, P.J. - March 24, 2016

    Appellant, J.P.C. (hereafter "Appellant" or "Father"), is appealing our decree of February 1, 2016 which granted the petition of G.J.K., the Child's Maternal Grandfather (hereafter "Petitioner" or "Maternal Grandfather"), to terminate Father's parental rights to T.J.K. (hereafter "Child").[1]

FACTUAL AND PROCEDURAL BACKGROUND

    T.J.K. was born on February 6, 2012. (N.T., 11/24/2015, p.15). Child is the biological son of R.K. (hereafter "Mother") and Appellant-Father. On or about June 15, 2012, when the Child was four months old, Mother and Father were arrested for attempting to steal televisions from a Walmart in Hazleton. At the time, the Mother and Father were both addicted to heroin and this theft was to support their drug addictions. *Id.* at 39-40,

---

[1] In this Court's Final Decree of February 1, 2016, we made twenty-four separate findings of fact. To the extent that these findings have not been challenged by Father on appeal, they are binding on the parties.

[FN-19-16]

1

143, 177. Additionally, upon the parents' arrest, heroin and drug paraphernalia was found in their vehicle. *Id.* at 39-40, 177. Upon their arrest, the Monroe County Office of Children and Youth ("OCY") intervened and placed temporary custody of the Child with his paternal uncle and the uncle's girlfriend for approximately two weeks. *Id.* at 17-20, 95, 144, 178-81, 204. The Child was next placed in the temporary custody of his paternal great-grandmother, L.M., who was residing in the same home as Mother and Father, for approximately seven to ten days. *Id.* at 144, 179-81. On June 26, 2012, OCY placed the Child in the custody of Petitioner, G.J.K., and his wife, V.K.,[2] the Child's maternal grandparents (hereafter "Maternal Grandparents"). *Id.* at 181.

On July 3, 2012, the Maternal Grandparents filed a custody complaint in the Monroe County Court of Common Pleas against the Child's biological parents. This complaint is docketed to No. 2012-05609 in the Monroe County Prothonotary's office. (N.T., 11/24/2015, p.6, 43; Petitioner's Exhibit 1). On December 20, 2012, an interim order was entered in this custody action awarding the Maternal Grandparents sole legal custody and sole

---

[2] V.K., the Child's Maternal Grandmother, is not a party to either the termination petition or the adoption proceedings, docketed at 15-9173 in the Carbon County Register of Wills/Clerk of the Orphans' Court's office, though she testified she now intends to join in G.J.K.'s petition to adopt T.J.K. (N.T., 11/24/2015, p.130). At the time the termination petition was filed, R.K., the Child's biological mother, who has since died, was a joint petitioner with G.J.K.

[FN-19-16]

2

physical custody of the Child. (N.T., 11/24/2015, p.7-10, 43; Petitioner's Exhibit 2). This order remains in place to the present time. On October 10, 2012, the Maternal Grandparents and Mother filed a petition in the Carbon County Court of Common Pleas to change the Child's surname, seeking to replace Father's surname with their own. *Id.* at 36, 85, 121-22. The name change action is docketed to No. 12-2194 in the Carbon County Prothonotary's office. An order granting this petition was entered on February 7, 2013, by the Honorable Joseph J. Matika of this court. (Petitioner's Exhibit No. 5). Maternal Grandfather initiated these termination proceedings in a joint petition with R.K., the Child's mother, on May 29, 2015. Tragically, Mother died of a drug overdose on June 29, 2015. *Id.* at 3, 39, 63, 67, 166. Since then Maternal Grandfather has proceeded with these termination proceedings as the sole petitioner.

From the time that the petition for termination was filed, until the time of the termination hearing held on November 24, 2015, Father was incarcerated at SCI Chester, where he is serving a state sentence of not less than eighteen months nor more than forty-eight months in prison for attempted robbery. (N.T., 11/24/2015, pp.27, 146, 170, 174-75, 203). At the time of the termination hearing, Father testified that he anticipated being released on parole within the next two to three weeks.

*Id.* at 12, 27, 35, 146. When Father filed the instant appeal on March 1, 2016, he simultaneously sought the continuation of his *in forma pauperis* status on the grounds that he cannot afford the filing fee because he remains incarcerated. (Father's Petition for Continuation of *In Forma Pauperis* Status for Purpose of Appeal, filed 03/01/2016).

Following a hearing on the petition to involuntarily terminate Father's parental rights on November 24, 2015, we left the record open for a period of forty (40) days at the request of Father. The purpose of this request was to give the parties an opportunity to discuss the possibility of a voluntary termination of Father's parental rights and an agreement for Father to thereafter maintain contact with his Child. No such agreement was filed within this time period; consequently, on February 1, 2016, we issued a Final Decree terminating Father's parental rights in and to Child. Father filed a timely Notice of Appeal along with a Concise Statement, pursuant to Pa.R.A.P. 1925(b) on March 1, 2016. *See also* Pa.R.A.P. 905(a)(2), 1925(a)(2)(i). This opinion is submitted in accordance with Pa.R.A.P. 1925(a)(2)(ii). For the reasons discussed below, we respectfully recommend that the termination of Father's parental rights be affirmed.

## DISCUSSION

In his Concise Statement, Father raises the following claims of error, which we have re-ordered and consolidated[3] for the sake of clarity:

(1) We committed an error of law and/or abused our discretion by finding that Petitioner presented clear and convincing evidence that Father exhibited a settled purpose to relinquish his parental rights and by not considering the explanations Father offered for his conduct and Petitioner's attempts to limit or frustrate the relationship between Father and Child.[4]

(2) We committed an error of law and/or abused our discretion by finding that Petitioner presented clear and convincing evidence that Father "would not remedy the conditions/refusal to perform parental duties where Father testified that his release/parole was forthcoming."[5]

(3) We committed an error of law and/or abused our discretion by failing to consider the needs and welfare of the Child.[6]

We begin with a discussion of the standard this court applies when ruling on a petition to terminate one's parental rights.[7]

---

[3] The first paragraph of Father's 1925(b) Statement states "[the trial court] committed an error of law and/or abuse of discretion by granting the Petition to terminate Natural Father's [(J.P.C's)] Parental Rights." Father's 1925(b) Statement, ¶1. Insofar as Father is attempting to raise a separate claim of error with this paragraph, any such claim is waived because this paragraph is insufficiently specific for us to "identify and address the issue an appellant wishes to raise on appeal." Commonwealth v. Hansley, 24 A.3d 410, 415 (Pa.Super. 2011) (citation and brackets omitted), *appeal denied*, 32 A.3d 1275 (Pa. 2011).

[4] Father's 1925(b) Statement, ¶¶2, 4.

[5] Father's 1925(b) Statement, ¶3.

[6] Father's 1925(b) Statement, ¶5.

[7] We note the standard of review applied on appeal of an order terminating parental rights as set forth by the Pennsylvania Supreme Court:

The termination of parental rights is controlled by statute, 23 Pa.C.S.A. § 2511[,] *et seq.* Under Section 2511, the trial court must engage in a bifurcated process. The initial focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies at least one of the nine statutory grounds in Section 2511(a). If the trial court determines that the parent's conduct warrants termination under Section 2511(a), it must engage in an analysis of the best interests of the child under Section 2511(b), taking into primary consideration the developmental, physical, and emotional needs of the child.

In re B.C., 36 A.3d 601, 606 (Pa.Super. 2012) (citations omitted). We terminated Father's parental rights pursuant to Section 2511(a)(1) of the Adoption Act. This section, and Section 2511(b), provide:

> (a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

---

When reviewing a trial court's decision to grant or deny a termination of parental rights petition, an appellate court should apply an abuse of discretion standard, accepting the findings of fact and credibility determinations if they are supported by the record, and reversing only if the trial court made an error of law or abused its discretion. As we have noted, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

In re D.C.D., 105 A.3d 662, 670-71 (Pa. 2014) (citation and quotation marks omitted). *See also* In re J.F.M., 71 A.3d 989, 992 (Pa.Super. 2013) ("If the findings of the trial court are supported by competent evidence, we will affirm even if the record could also support the opposite result.") (citation omitted); *and* In re B.L.W., 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*) ("Where a trial court has granted a petition to involuntarily terminate parental rights, th[e] [Superior] Court must accord the hearing judge's decision the same deference that it would give to a jury verdict") (citation omitted), *appeal denied*, 863 A.2d 1141 (Pa. 2004).

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\* \* \*

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b). In order to establish a legal basis for termination under Section 2511(a)(1), Petitioner must establish, by clear and convincing evidence,[8] that during the relevant six-month period Father either (1) demonstrated a settled purpose of relinquishing parental rights or (2) refused or failed to perform parental duties. _See_ In re J.T., 983 A.2d 771, 776-77 (Pa.Super. 2009). These duties are broad, and involve both the tangible and intangible aspects of being a parent:

---

[8] "The standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." In re E.D.M., 708 A.2d 88, 91 (Pa. 1998) (citation and quotation marks omitted).

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, [the Pennsylvania Supreme Court] has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life.'

In re C.M.S., 832 A.2d 457, 462 (Pa.Super. 2003) (quoting In re Burns, 379 A.2d 535, 540 (Pa. 1977)), *appeal denied*, 859 A.2d 767 (Pa. 2004).

Once Petitioner has established grounds for termination, we must consider whether the totality of the circumstances clearly warrant termination. In re B.,N.M., 856 A.2d 847, 855 (Pa.Super. 2004) (citation omitted), *appeal denied*, 872 A.2d 1200 (Pa. 2005). When looking at the totality of the circumstances, our courts primarily look at three factors. In re J.T., 983 A.2d at 777 (citing In re E.D.M., 708 A.2d 88, 92 (Pa. 1998)). First, the court analyzes the parent's explanation for his or her conduct. *Id.* Second, the court analyzes post-abandonment contact between parent and child. *Id.* Finally, the

court analyzes the effect termination will have on the child as required by Section 2511(b). *Id.* We will discuss the issues Father is raising on appeal as they relate to the aforementioned standards we applied in terminating Father's parental rights.

A. Father Exhibited a Settled Purpose to Relinquish His Parental Claim

In his first claim of error raised on appellate review, Father asserts that we abused our discretion in finding that Petitioner had demonstrated, by clear and convincing evidence, that Father had exhibited a settled intent to relinquish his parental rights. Father also contends that we abused our discretion by not considering a number of factors showing that he was limited and/or prevented in exercising his parental rights and duties, namely, his incarceration at the present time, the strained relationship between Father and Maternal Grandfather, Maternal Grandfather's efforts to limit or frustrate Father's relationship with Child, Maternal Grandfather failed to properly serve Father with the petition to change Child's name, Maternal Grandfather's insistence that Child address him as "Dad," and that Maternal Grandfather changed the address of his residence. Lastly, Father asserts that we failed to consider the possibility for the development of a meaningful relationship between Father and Child, as he is now the Child's sole living biological parent and he will soon be released from

prison. As previously stated, we must first determine if clear and convincing evidence establishes a statutory basis for termination set forth in Section 2511(a)(1) and then consider, *inter alia*, Father's explanation for his or her conduct. There is considerable overlap in the evidence relevant to these determinations and Father has essentially merged the two into one in his Concise Statement; therefore we address both issues together.

As a preliminary matter we note that Father's claims relating to Child addressing Petitioner as "Dad," the fact that Father is the Child's sole remaining biological parent, and the possibility of Father remedying his past failure to perform parental duties and of developing a meaningful relationship with the Child upon his release from prison are not relevant to our determination that Father exhibited a settled purpose of relinquishing his parental claim to the Child, nor are they relevant to our analysis of Father's explanations for his conduct. Instead, because these issues are relevant to our determination of the best interests of the Child, they are discussed as part of our analysis of that factor, *infra*.

Maternal Grandfather and Mother filed the petition to terminate Father's parental rights on May 29, 2015. Therefore, while the statutory six-month period between November 29, 2014 and May 29, 2015 is the primary period to be examined, it is not

the exclusive period. "Although the six month period immediately preceding the filing of the petition is most critical to [our] analysis, [we] must consider the whole history of the case and not mechanically apply the six-month statutory provision." In re I.J., 972 A.2d 5, 10 (Pa.Super. 2009) (citation omitted). In order to decide if the totality of the circumstances requires the involuntary termination of Father's parental rights, we must "examine the individual circumstances of [his] case and consider all of the explanations of [Father] . . . ." Id. (citing In re B.,N.M., 856 A.2d at 855). Additionally, because Father was a non-custodial parent at the time the termination petition was filed, we must also consider whether the Petitioner, as the party with custody of the Child, "deliberately created obstacles and has by devious means erected barriers intended to impede free communication and regular association between [Father] and his [] child." In re C.M.S., 832 A.2d at 463 (quoting In re Shives, 525 A.2d 801, 803 (Pa.Super. 1987)).

In examining a parent's explanation for failing to perform his parental duties, we must consider all explanations offered. See In re K.Z.S., 946 A.2d 753, 758 (Pa.Super. 2008). "The pertinent inquiry is not the degree of success a parent may have had in reaching the child, but whether, under the circumstances, the parent has utilized all available resources to preserve the

parent-child relationship." In re Shives, 525 A.2d at 803 (citing In re Adoption of Faith M., 501 A.2d 1105, 1108 (Pa. 1985)). Included in this effort is the need for the parent to "exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." In re B.,N.M., 856 A.2d at 855 (citation omitted).

Nevertheless, a parent "is not required to perform the impossible, [but] he must act affirmatively to maintain his relationship with his child, even in difficult circumstances." In re G.P.-R., 851 A.2d 967, 977 (Pa.Super. 2004) (citing In re Burns, 379 A.2d 535, 541 (Pa. 1977)). As previously noted, Father has been incarcerated for longer than the six month statutory period under Section 2511(a)(1). However, it is well-established that "the fact of incarceration does not, in itself, provide grounds for the termination of parental rights." In re B.,N.M., 856 A.2d at 855 (citation omitted). At the same time, "a parent's responsibilities are not tolled during incarceration." Id. The law recognizes that while incarceration "may make it more difficult [for one] to parent in a traditional fashion, the fact of incarceration alone does not obviate the duty to exercise reasonable firmness under the circumstances to maintain a secure parent/child bond." In Interest of A.P., 692 A.2d 240, 245 (Pa.Super. 1997) (citation omitted). The court, therefore, "must analyze whether the

parent utilized those resources available while in prison to maintain a relationship with his child." In re Adoption of Dale A., II, 683 A.2d 297, 302 (Pa.Super. 1996) (citation omitted).

Father has not had custody of the Child since approximately July of 2012 when OCY placed the Child in the care of various relatives, before ultimately placing the Child in the care of Maternal Grandparents. This custody arrangement was confirmed by a custody order entered by the Monroe County Court of Common Pleas on December 20, 2012. (Petitioner's Exhibits 1 & 2). Father testified he had no knowledge of these proceedings, and that prior to the termination hearing, he believed Maternal Grandparents' custody of the Child was still pursuant to the initial OCY placement. (N.T., 11/24/2015, pp.21, 31-34, 181-84). Contradicting this assertion, Petitioner submitted a copy of a certificate of service indicating that Father was personally served with Maternal Grandparents' complaint in the aforementioned custody action. (N.T., 11/24/2015, pp.160, 183; Petitioner's Exhibit 6).

Regardless of what order placed custody of the Child with the Maternal Grandparents in Father's mind, since the time custody of the Child has been with the Maternal Grandparents, Father's visits with the Child have been few and far between, the total number of visits and attempted visits being in dispute. (N.T., 11/24/2015, pp.22-24, 52-53, 65-67, 114, 131-

32, 157, 196-97). At the termination hearing, Maternal Grandparents testified they had not received any requests from Father to see the Child or any phone calls from Father asking to speak to the Child for almost three years prior to the filing of the termination petition. *Id.* at 52, 100, 132. No one contacted the Maternal Grandparents on Father's behalf, requesting permission for Father to visit the Child. *Id.* at 53. Also, no letters or cards from the Father to the Child on the Child's birthday or on major holidays were received by the Maternal Grandparents. *Id.* at 53, 132. Nor did the Father provide any monetary or non-monetary child support to Maternal Grandparents. *Id.* at 15-16, 53, 132. The Petitioner also testified that his phone number and home location have not changed since custody was placed with the Maternal Grandparents. *Id.* at 100.

Petitioner also testified that Father's brother came to his house on or about July 12, 2012 and asked to take the Child. (N.T., 11/24/2015, pp.52, 114). Because Petitioner was unsure as to whether Father's brother intended to take the Child for the day or to keep the Child, he denied the request and called the police. *Id.* at 52-53. Father testified that he had accompanied his brother that day, but did not get out of the car. *Id.* at 196. Father stated that his intent was to take the Child out for the day and return him to the Maternal

Grandparents, not to take the Child away from them. *Id.* at 196-97. Petitioner further testified that he had a telephone conversation with Father in July of 2013, during which Father, who was living in Arizona, asserted that Father would never return to Pennsylvania. *Id.* at 54. Father disputes Petitioner's account of this conversation.

Father's claims that Maternal Grandparents frustrated or limited his relationship with the Child are without merit. Petitioner testified that although his mailing address was changed pursuant to a 911 reorganization plan, the physical location of his home at which he and his wife resided with the Child never changed. (N.T., 11/24/2015, pp.51-52, 100). Moreover, Father testified that he had been to the Maternal Grandparents' home, was never aware of the mailing address, and was not affected by the numerical change in the address. *Id.* at 161. Father also acknowledged that his relatives could have provided him with Maternal Grandparents' mailing address if he had asked them to do so, but he never made such a request. *Id.* at 161-62.

As to Father's complaint that he was never properly served with the petition to change the Child's surname, this did not create an obstacle or barrier to Father's contact with the Child. The Child's residence and the telephone number of his guardians, Maternal Grandparents, remained unchanged and Father

had the means by which to contact Maternal Grandparents and/or the Child if he had expended the necessary effort.[9]

Lastly, as to the poor relationship between Maternal Grandparents and Father, this was clear from the testimony at the termination hearing. (N.T., 11/24/2015, pp.92, 98-99, 140, 149-150, 161, 163-64). There is, however, contradictory testimony regarding the contents of a telephone conversation between Father and Petitioner that occurred in July of 2013. Father's account of this conversation is that Petitioner told him that he would never see his Child again. *Id.* at 187-88. Petitioner credibly testified that Father claimed he had won the lottery and would never return to Pennsylvania and that Father argued with Petitioner over testimony Petitioner gave at a

---

[9] Father's assertion that his failure to contest the name change petition should not be considered as evidence of a settled course to relinquish his parental rights, does not establish an error of law or abuse of discretion. According to the docket entries for the change of name petition, Carbon County No. 2194 of 2012, the petition was filed on November 10, 2012. Father testified that in October of 2012, he relocated to Arizona. (N.T., 11/24/2015, pp.25, 27, 30, 163). Father testified that he went to Arizona to attend school. *Id.* at 25, 28-29, 156, 163, 186. Furthermore, Father asserted that he had been in contact with the Child's Mother, R.K., up until early 2015. *Id.* at 149-50, 157-58.

D.C., Father's mother, testified that whenever R.K. was present in her home when Father called, R.K. and Father spoke with one another about their son. (N.T., 11/24/2015, p.213); *see also id.* at 147, 149-54, 157-59, 195. R.K. was one of the petitioners in the name change action. Consequently, Father's testimony that R.K. never informed him of the name-change proceedings is unlikely. Regardless, even if we accepted Father's explanation that he did not contest the change of name action because he was unaware of it, there is abundant other competent evidence in the record to support our decision to involuntarily terminate Father's parental rights.

hearing concerning Father's worker's compensation benefits. *Id.* at 54.

Even if we were to accept Father's account of this phone conversation, at no time after this conversation did Father demand that Maternal Grandparents allow him to communicate with his son either by telephone or correspondence. Additionally, Father offered his own personal belief that any correspondence addressed to his son would be perfunctorily discarded without being given or read to the Child. (N.T., 11/24/2015, pp.149-150, 161, 164). Father further testified that he did not send any correspondence to Maternal Grandparents' residence because he knew the Child's Mother no longer resided there. *Id.* at 153. Father did not identify any instance in which Maternal Grandparents actually discarded or refused correspondence of his that was addressed to the Child.

As to the relationship between Father's family and the Maternal Grandparents, Maternal Grandmother testified that in her dealings with members of Father's family, she was initially receptive to them visiting the Child and sending gifts to the Child for his birthday and for Christmas. (N.T., 11/24/2015, pp.132-34). Maternal Grandmother testified that over time, there was less contact between members of Father's family and the Child and said gifts for the Child were never delivered; as a result she concluded that Father's relatives were not

interested in developing a relationship with the Child. *Id.* The evidence did not establish that the members of Father's family were contacting her on Father's behalf as opposed to doing so of their own accord. After the Child's Mother entered drug rehab around December of 2014, Maternal Grandmother decided that it was better that Father's family not be involved with Mother[10] or the Child and informed them of her decision. *Id.* at 104, 134.

D.C., Father's mother, also testified regarding her attempts to have contact with the Child. (N.T., 11/24/2015, pp.211, 215, 217). D.C. testified that Father asked her to pass letters to R.K., the Child's mother, but never read those letters, so she did not know if there were any messages for the Child in them. *Id.* at 210-11. Only once, according to D.C., did Father ask her to contact and send gifts directly to the Child, around Christmas of 2012. *Id.* at 211. Father otherwise did not ask D.C. to give letters for the Child to the Maternal Grandparents. *Id.* at 215.

Father testified that he was aware that Maternal Grandmother had asked his relatives to stay away from the Child. (N.T., 11/24/2015, pp.150, 195). When asked why Father did not use his relatives as intermediaries to deliver correspondence

---

[10] Prior testimony established that Mother had not begun using heroin until after she began her relationship with Father, who was also a heroin user at the time. (N.T., 11/24/2015, pp.63-64, 89-90).

[FN-19-16]
18

for his Child, he stated that he did not want to be accused of harassing the Maternal Grandparents. *Id.* at 159. At the same time, Father acknowledged that while he was in prison he was able to communicate with both R.K. and members of his family and either could have served as intermediaries to deliver messages to the Child. *Id.* at 153, 159-60.

Father was in contact with the Child's Mother during his incarceration through at least early 2015. According to Father, whenever they spoke with one another, he asked about their Child. (N.T., 11/24/2015, pp.147, 149-54, 157-59, 195). In 2013, Father sent a Christmas card to Paternal Grandmother to be given to Mother for delivery to their Child. *Id.* at 153. Afterwards, Father never checked if this card had been delivered. *Id.* Father also testified that because of the relative costs of postage compared to those of making telephone calls from prison, he communicated with his family by telephone, rather than through the mail. *Id.* at 161. Father did not want the Child to visit him while he was incarcerated, *id.* at 202, but testified that he wanted OCY to arrange supervised visits between him and the Child upon his release from prison on parole. *Id.* at 155, 202.

Father testified that attempting to have contact with his Child by correspondence would have been futile because he believed Maternal Grandparents would not accept any

correspondence from him, and even if they did, the Child would have been too young to read, and he believed Maternal Grandparents would not read any letters to the Child. Importantly, Father never actually sent any correspondence directly to the Child. *Compare* In re Adoption of Atencio, 650 A.2d 1064, 1067 (Pa. 1994) (finding that mother impeded father's reasonable efforts to maintain his relationship with his child where mother refused to accept correspondence and presents that were sent to the child by regular mail, withheld a present that was sent to the child by certified mail, and did not permit the child to speak to father over the telephone). Even if we were to accept Father's explanation as to why he did not send cards or other correspondence to the Child at the Maternal Grandparents' residence, Father made no attempt to have consistent contact with the Child through alternate means. The Child's Mother, although she did not have custody of or reside with the Child, still had contact with the Child and with the Maternal Grandparents, *i.e.*, her parents. Prior to the point at which Father and Mother ceased communicating with each other in early 2015, Mother would have been a logical intermediary for Father to send messages and gifts to the Child, but aside from one Christmas card Father sent in 2013 for R.K. to deliver to their son, Father never asked Mother to keep their son advised of his existence or his interest in the Child's life and well-

being. Father made no other efforts to contact his Child, including any attempt to contact OCY, whom he believed was supervising the Child's placement with the Maternal Grandparents, to assist him in having contact with his son during his incarceration. (N.T., 11/24/2015, pp.201-203).

Based upon the foregoing, we concluded Petitioner established by clear and convincing evidence that Father's conduct for at least six months prior to the filing of the petition for the termination of his parental rights demonstrated a settled purpose of relinquishing his parental rights. We also determined that under the totality of the circumstances, Father's explanations for his conduct were insufficient to excuse his failure to act affirmatively and with reasonable firmness to maintain the parent/child bond between him and his Child. Notably, Father did not utilized any of the resources available to him while incarcerated to maintain a relationship with his child, even though he was in contact with the Child's Mother, had relatives who could have served as intermediaries, and could have inquired of OCY what, if any, of their services were available to him during his incarceration.

As to Father's failure to perform his parental duties, although he has been incarcerated since approximately February of 2014, Father has not provided a sufficient excuse for his failure to exercise parental duties after the Child was placed

in the care of the Maternal Grandparents. Since Father's arrest for theft when the Child was five months old, Father has continued to engage in criminal activity and has been absent from the Child's life. Father's continuing criminal activity includes an attempted robbery, to which he later pled guilty and for which he is currently incarcerated, and violating the conditions of his bail by absconding to Arizona for nearly nine months. At no time after the Child was placed in the care of Maternal Grandparents did Father provide any financial or non-monetary support to his Child. We find that under the totality of the circumstances, Father's belief that any attempt to have contact or a relationship with his Child would be futile in light of his belief that the Maternal Grandparents would thwart any contact between him and the Child is inadequate to explain his failure to perform parental duties.

In his second claim of error raised on appeal, Father asserts that we abused our discretion by concluding that under 23 Pa.C.S.A. § 2511(a)(1), Petitioner established by clear and convincing evidence that Father would not remedy his past failure to perform his parental duties where he testified at the termination hearing that his parole from prison was forthcoming and he would attempt to rectify his past absence from the Child's life. This assertion was not relevant to our analysis of whether Father exhibited a settled purpose of relinquishing

his parental claim to the Child, or has refused or failed to perform parental duties. Section 2511(b) specifically prohibits us from considering "any efforts by the parent to remedy the conditions described" in Section 2511(a)(1) "which are *first initiated subsequent to the giving of notice of the filing of the [termination] petition*." *Id.* (emphasis added). *See also* T.J.B. v. E.C., 652 A.2d 936, 945 (Pa.Super. 1995) (discussing the application of Section 2511(b)'s prohibition on considering remedial measures that begin after the filing of a termination petition with respect to Section 2511(a)(6)). Any consideration of Father's future involvement in the Child's life is limited to our analysis of the best interests of the Child and is discussed, *infra*. Because no abuse of discretion or error of law has been committed in not considering Father's stated intentions after his release from prison, Father is entitled to no relief on this claim.

B. Father's Post-Abandonment Contact With Child

Once Petitioner has established grounds for termination, we analyze post-abandonment contact between Father and Child as part of our determination of whether the totality of the circumstances clearly warrants termination of Father's parental rights. In re J.T., 983 A.2d at 777. Father has not raised a specific challenge as to this aspect of our decision to terminate his parental rights in his concise statement.

[FN-19-16]

23

Nevertheless we discuss post-abandonment contact in the context of whether Father's stated intent to rectify his past neglect of his parental duties upon his release on parole is a required element of our analysis.

> To be legally significant, the post-abandonment contact *must be steady and consistent* over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.

In re Z.P., 994 A.2d 1108, 1119 (Pa.Super. 2010) (emphasis added) (citations and brackets omitted). Applying this standard, we do not rely solely on Father's stated intent to resume his parental duties upon his release from prison, but rather we examine his history of post-abandonment contact with the Child. *See id.* at 1121 ("A parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights.") (citation omitted).

The Superior Court has held that when a parent is incarcerated, the sending of occasional letters, child support and gifts is insufficient post-abandonment contact to establish a serious intent on a parent's part to recultivate a parent-child relationship and a willingness and capacity to undertake a parental role. In re D.J.S., 737 A.2d 283, 286 (Pa.Super.

1999).  *See also* <u>In re C.L.G.</u>, 956 A.2d 999, 1005-1006 (Pa.Super. 2008) (*en banc*) (finding that sending a blanket and a videotape of mother reading a book sent to her child from prison as gifts were insufficient post-abandonment contact, and affirming termination of mother's parental rights).

Here, Father's post-abandonment contact with T.J.K. was anything but steady and consistent, in fact, it was nearly non-existent.  The only instance in which Father attempted to have any contact with the Child since October of 2012 was when he asked the Child's Mother to pass along a Christmas card from him in 2013.  Father testified that he asked the Child's Mother to keep him updated as to the Child's well-being, but without any actual communication with the Child, even indirectly through the Child's Mother, the Paternal Grandmother, or other relatives, we cannot conclude that Father has demonstrated his willingness and capacity to undertake a parental role with respect to T.J.K.  At best, Father's actions prior to the filing of the termination petition suggest a tangential interest in the Child's welfare.  Father has failed to carry his burden of proof that his post-abandonment contact with the Child demonstrates his desire to cultivate a parent-child relationship and to reestablish his parental responsibilities.

## C. The Termination of Father's Parental Rights Was In the Best Interest of the Child

In his third and final claim of error raised on appeal, Father asserts that we abused our discretion by finding that the termination of his parental rights was in the best interest of T.J.K. In his Concise Statement, Father relies on largely the same grounds previously asserted with respect to his claim of error regarding our finding that he had exhibited a settled intent to relinquish his parental claim and refused or failed to perform his parental duties. We need not discuss those grounds which we have already addressed with respect to that issue, *supra*. Consequently the following grounds are addressed herein: the Petitioner's insistence that the Child refer to Petitioner as "Dad," Father is the Child's sole remaining biological parent, and the possibility for the development of a meaningful relationship between the Child and Father.[11]

---

[11] Father also raised two other challenges to our determination that it was in the best interests of the Child to terminate his parental rights. First is that "[t]he Paternal Grandparents were attending to the [C]hild's needs[.]" Father's 1925(b) Statement, ¶5a. The Child's paternal great-grandmother, *i.e.* Father's grandmother, had custody of the Child for approximately seven to ten days before OCY placed the Child in the care of Maternal Grandparents. (N.T., 11/24/2015, pp.144, 179-80). Father did not raise any such claim, nor present any testimony, that the Child's Paternal Grandparents, *i.e.* Father's parents, were attending to the Child's needs at the termination hearing. As such this issue is waived. *See* Pa.R.A.P. 302; *In Interest of R.P.*, 957 A.2d 1205, 1222 (Pa.Super. 2008) (issues raised for the first time on appeal are waived and cannot be considered). In addition, our Supreme Court has held that a Rule 1925(b) statement

Our analysis of the best interests of the Child focuses on "whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." In re T.D., 949 A.2d 910, 920 (Pa.Super. 2008) (citation omitted), *appeal denied*, 970 A.2d 1148 (Pa. 2009). "The emotional needs and welfare of the child have been properly interpreted to include [i]ntangibles such as love, comfort, security, and stability." In re T.S.M., 71 A.3d 251, 267 (Pa. 2013) (citation and quotation marks omitted). The court "must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." In re T.M.T., 64 A.3d 1119, 1127 (Pa.Super. 2013) (citation omitted). On this question, it was in T.J.K.'s best interests to terminate Father's parental rights.

Father claims that we failed to consider the fact that Petitioner-Maternal Grandfather insists that Child address him as "Dad."[12] The record does not support Father's contention that

_____

cannot be used to raise a claim for the first time on appeal. Steiner v. Markel, 968 A.2d 1253, 1257 (Pa. 2009).

Father also asserts that we failed to consider the Child's young age in determining the best interests of the Child without further elaboration. Father's 1925(b) Statement, ¶5e. This issue is waived because it is too vague for us to "identify and address the issue [Father] wishes to raise on appeal." Hansley, 24 A.3d at 415.

[12] We note that Father does not raise any challenge to the fact that Child addresses his Maternal Grandmother as "Mom." Therefore, to the extent Father's challenge to our determination that it was in the best interest of the Child to terminate Father's parental rights relies on the manner in which the Child address his Maternal Grandmother, this claim is waived. See Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included

Petitioner insists that the Child address him as such, rather the Child has spontaneously decided to refer to his Maternal Grandfather as "Dad." (N.T., 11/24/2015, pp.108, 122-25). Petitioner and his wife have attempted to correct the Child, instructing him to address them with terms of endearment consistent with those used for grandparents, but the Child continues to address them as "Dad" and "Mom." *Id.* at 123, 135-36.

Father claims that in light of his forthcoming parole there exists a possibility that Father will develop a meaningful relationship with his Child. Father also expressed an intent to rectify his past neglect of his parental duties. At the time of the termination hearing, Father expressed his belief that he would be released on parole within two to three weeks of the date of the hearing, but he did not indicate, what if any measures he would take to be in contact with Child if he were not released on parole within the time period he specified, and remained incarcerated for the balance of his sentence. (N.T., 11/24/2015, pp.12, 27, 35, 146). Father also testified that it was his intention upon his release from prison to attend to any outstanding issues regarding his injured elbow (*i.e.*, surgery), complete a motorcycle mechanic training program in Arizona, and

in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."); *see also* Commonwealth v. Lord, 719 A.2d 306, 309 (Pa. 1998) ("Any issues not raised in a 1925(b) statement will be deemed waived.").

seek employment as a motorcycle mechanic in this area. Father also testified that it was his intent to seek the assistance of the Carbon County Office of Children and Youth to arrange supervised visitation with his son upon his release. *Id.* at 155, 165, 168-69, 206. Lastly, Father asserted that he has not used heroin or other illegal substances since 2012. *Id.* at 156. However, Father has only had limited treatment for his drug addiction, most recently a six-month therapeutic therapy rehabilitation program while he has been incarcerated. *Id.* at 176-77.

Father also admitted to an extensive substance-abused related criminal history beginning in 1999 when he was placed on probation for possession of marijuana for a period of one year. (N.T., 11/24/2015, pp.172-175). Father has been incarcerated seven times since then. *Id.* at 169, 172-175. Father lost custody of the Child after he and the Child's Mother were arrested for theft. A few weeks after that theft arrest, Father was involved in a DUI-related accident, during which Mother was seriously injured. *Id.* at 41, 115. In October of 2012, while Father was on bail for the forgoing DUI and retail theft charges, he was involved in an attempted robbery. *Id.* at 25, 186. Shortly after that, in November 2012, Father moved to Arizona in violation of his existing bail conditions. *Id.* at 30. Father did not return to Pennsylvania until July 2013, and

was subsequently arrested. *Id.* at 188-89, 205. Father pled guilty in the attempted robbery case, and in or around February 2014, he was sentenced to his current term of incarceration. Father acknowledged that all of his crimes were to support his heroin usage, which he has been using, on and off, since 2003. *Id.* at 168, 174-76.

The uncontradicted testimony of Maternal Grandparents is that they provide for the Child's developmental, physical and emotional needs. (N.T., 11/24/2015, pp.60-62, 113, 130-131). Maternal Grandparents have been the Child's sole caregivers since the Child was approximately five months old until the present. They have provided his food, clothing and housing, for his physical and mental well-being, and they have raised him as their own child. *Id.* There is a parental bond between the Maternal Grandparents and the Child, so much so that the Child refers to his Maternal Grandparents as "Dad" and "Mom." *Id.* at 108-109, 122-25, 135-36. The parental bond which has developed between them is beneficial to the Child's continued physical, mental, and emotional development. We believe this relationship will be strengthened by allowing the Maternal Grandparents to adopt the Child. Notwithstanding Father's argument that the termination of his parental rights is not in the Child's best interests because he is the Child's sole surviving biological parent, Father has admitted that he has no relationship with the

Child at this time and that he believes his son would not even recognize him as his father. *Id.* at 164. Father also testified that it was not his intent, in contesting the termination of his parental rights, to one day seek primary custody of his Child. *Id.* at 155, 197.

Having taken all of these facts into consideration, we found it was in the best interests of the Child to terminate Father's parental rights. The Child will not suffer any negative effects from the termination. Father has not been involved in the Child's life for over two years and his conduct during his absence has shown that he has not remedied the circumstances that led to the Child's initial placement with Maternal Grandparents. At the time Father filed the instant appeal, he remains incarcerated. The Child's best interests are served by allowing him to remain with the Maternal Grandparents, by allowing the bond between them to grow, and by allowing Maternal Grandparents to adopt him. *See* In re J.F.M., 71 A.3d at 997-98 (holding it was in a child's best interests to terminate parental rights when the child would not suffer negative effects from termination and child had bonded with foster parents who had provided for the child's needs).

CONCLUSION

For the reasons stated above, we did not abuse our discretion nor commit an error of law in terminating Father's

[FN-19-16]
31

parental rights. Furthermore, there is competent evidence to support our findings. Accordingly, we respectfully recommend that our decree terminating Father's parental rights be affirmed.

BY THE COURT:

_____
                                    P.J.